Lebron v New York City Hous. Auth. (2018 NY Slip Op 01116)





Lebron v New York City Hous. Auth.


2018 NY Slip Op 01116


Decided on February 15, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 15, 2018

Manzanet-Daniels, J.P., Mazzarelli, Andrias, Gesmer, Oing, JJ.


5326 303775/10

[*1]Anaima Lebron, etc., Plaintiff-Respondent, 
v
The New York City Housing Authority, Defendant-Appellant, The City of New York, Defendant.


Herzfeld & Rubin, P.C., New York (Sharyn Rootenberg of counsel), for appellant.
Sim & Record, LLP, Bayside (Sang J. Sim of counsel), for respondent.



Order, Supreme Court, Bronx County (Ben R. Barbato, J.), entered October 24, 2016, which, to the extent appealed from, denied the motion of defendant New York City Housing Authority (NYCHA) for summary judgment dismissing the complaint as against it, unanimously reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment accordingly.
On October 25, 2008, the decedent, Yovanna Angomas, told her mother, plaintiff Anaima Lebron, that she was having an asthma attack. Plaintiff asked her other daughter to call 911 and began CPR. At approximately 8:27 p.m., EMTs arrived at the seventh floor apartment and found the decedent on the bedroom floor in respiratory arrest. Within minutes of this initial assessment, the decedent had no pulse, no vital signs, no blood pressure and appeared to be in cardiac arrest. Consequently, the EMTs requested the assistance of paramedics from an Advanced Life Services unit.
At approximately 8:44 p.m., the paramedics arrived and attempted to put the decedent on a Lifepak 12 monitor, which malfunctioned. The paramedics then used an Automated External Defibrillator until a working Transcare monitor arrived at approximately 8:52 p.m., and continued to administer CPR and follow treatment protocols, including the administration of medications, in an effort to restart the decedent's heart. However, the decedent remained in asystole, a complete flatline indicating no heart rhythm. Nevertheless, the paramedics decided to transport her to the nearest hospital.
Due to decedent's weight (approximately 300-400 pounds), the paramedics requested that the FDNY bring a Stokes basket, which arrived at approximately 9:02 p.m. After placing the decedent in the Stokes basket, which took approximately five minutes, the paramedics maneuvered the decedent into the elevator, which experienced stoppages on the way down. At 9:38 p.m., the decedent was placed in an ambulance and transported to the hospital, where she was pronounced dead shortly after her arrival.
Plaintiff testified at her 50-h hearing that she left the apartment "like four minutes later" than the emergency personnel. It took her two minutes to get to the lobby and the decedent arrived 10 or 15 minutes later (amounting to a delay of between 16 and 21 minutes). At her deposition, plaintiff testified that she was waiting in the lobby for 30 minutes before the decedent arrived there.
Paramedic Fieldcamp testified that she and two firefighters went into the elevator with the decedent. The elevator stopped one time and stuck between floors. It started to move and then got stuck a second time. While it felt like an eternity, it probably was not. EMT Roman testified that it took him three minutes to get from the decedent's apartment to the lobby. He waited 5 to 10 minutes for the elevator to arrive in the lobby and left for the hospital at 9:38 p.m., [*2]approximately an hour and 10 minutes from the first call.
Plaintiff seeks to recover damages allegedly sustained due to NYCHA's negligence in maintaining the elevator on the grounds that it delayed paramedics from transporting the decedent to a nearby hospital for more intensive treatment.
NYCHA failed to demonstrate that it lacked prior notice of elevator stoppages in the building, as its employee's testimony, and its maintenance records, submitted with its moving papers show that the elevators experienced numerous malfunctions and stoppages in less than two months before the incident (see Villalba v New York El. & Elec. Corp., Inc., 127 AD3d 650 [1st Dept 2015]; Scafe v Schindler El. Corp., 111 AD3d 556 [1st Dept 2013]). Although NYCHA's elevator repair person testified that a dispatcher would inform him when the elevator was broken, no logbook documenting complaints or an affidavit from someone who would actually receive complaints was produced.
However, allegations of negligence, even if provable, are insufficient to establish liability absent proof that the negligence was a proximate cause of the injury (see Ohdan v City of New York, 268 AD2d 86, 89 [1st Dept 2000], appeal dismissed 95 NY2d 885 [2000], lv denied 95 NY2d 769 [2000]). Although "issues of proximate cause are generally fact matters to be resolved by a jury" (Benitez v New York City Bd. of Educ., 73 NY2d 650, 659 [1989]), "[t]here are certain instances . . . where only one conclusion may be drawn from the established facts and . . . the question of legal cause may be decided as a matter of law" (Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315 [1980]; see also D' Avilar v Folks Elec. Inc., 67 AD3d 472 [1st Dept 2009]).
Here, NYCHA presented unrefuted evidence demonstrating that the decedent's cardiac rhythm was asystole, a dire form of cardiac arrest in which the heart stops beating and there is no electrical activity in the heart, and that she showed no signs of life in the hour between the arrival of emergency personnel and her transfer into the elevator, despite the emergency responders' continuous resuscitative efforts. Furthermore, NYCHA's medical expert stated that "[t]he prolonged and unsuccessful resuscitative course in an asystolic patient is associated with an extremely poor outcome" and that "the decedent's obesity made resuscitative efforts more difficult and further reduced [her] likelihood of survival." Thus, he opined, "within a reasonable degree of medical certainty[,]. .. the outcome for the decedent would [not] have changed had the transport time within the elevator been shorter."
By these facts and its expert's opinion, NYCHA demonstrated its prima facie entitlement to judgment as a matter of law by showing that the stoppage of its elevator, and resulting delay of the decedent's arrival at the hospital, were not a proximate cause of the decedent's death. In opposition, plaintiff, who did not submit an expert's affirmation, failed to refute the averment of NYCHA's expert that the elevator stoppage did not change the outcome for the decedent or raise a triable issue of fact as to whether NYCHA's purported negligence "was a substantial cause of the events which produced the injury" (Derdiarian, 51 NY2d at 315).
Plaintiff argues that NYCHA did not satisfy its prima facie burden because the testimony of paramedic Pinkhasov shows that the decision to transport decedent to the hospital was based, in part, on the possibility that her heart was beating, despite some indications that she was in a state of asystole. However, this testimony did not suffice to raise a material issue of fact as to proximate cause.
When asked if there was a time when he decided to transport the decedent, rather than continue care at the scene, Pinkhasov responded:
"this was a 30 year-old female who [was] young, so just by age alone and that per BLS crew, ... she was fresh, that means that she just arrested ... and she also was on the heavier side, that to get a termination time through a telemetry on a person who is on the heavy side it's a little harder because they believe that we sometimes - you know, because they have too much body mass, you can't get a really could [sic] reading, they need an ultrasound to get an actual good picture of a heart, so I decided to transport her because she was young and there was a possibility."
However, this testimony was speculative, not based on any degree of medical certainty [*3]and insufficient to refute the opinion of NYCHA's medical expert. Indeed, Pinkhasov further testified that: (i) when he arrived at the scene the decedent was in cardiac arrest, which "means they have no blood flowing through their system, their heart is not operating and they are not breathing"; (ii) when they placed the decedent on the Transcare Monitor it showed a "[l]ack of heart rhythm," and no electrical or mechanical activity; (iii) decedent continuously "remained in asystole, which is a complete flatline," and, despite his efforts, he never got any response out of the decedent's heart and she never regained consciousness or breathed on her own; (iv) decedent's vital signs were checked six times and there was no blood pressure, pulse or respiration; (v) the fact that the decedent was obese did not make a difference with respect to the equipment used and he never had a problem with respect to readings because of obesity; and (vi) when the decedent was put in the elevator "she didn't have any blood pressure, she was dead."
Pinkhasov's partner, paramedic Fieldcamp, testified that when she arrived at the apartment at 8:50 p.m., the decedent was not breathing, had no pulse, was in cardiac pulmonary arrest and was asystole. At 9:20 p.m, things had not changed. When asked why she did not do a field termination, Fieldcamp responded:
"There's various circumstances. Sometimes the patient's age. Which the patient could have been pronounced dead at her home. After 20 minutes of CPR, you get on the phone with the doctor and pronounce the patient dead. You also have to look at the psychological circumstances in the house removal of the patient and someone that age you're going to do everything possible you can, but then again she could have been pronounced dead as well."
Fieldcamp explained that there were other variables that affected her decision to transfer the decedent to the hospital, primarily that her entire family was witnessing her die:
"[Y]ou have other people around you. I believe that there are some paramedics, EMS providers that may have pronounced her in the house. I myself probably [would have] pronounced her in the house in [a] different set of circumstances, but when you get into that whole thing [referring to the decedent's family watching her die], and, you know, you're flipping a mattress, you're in a tight apartment, its disheveled in the house, you're working and you're doing your best effort."
Furthermore, EMT Mendez testified that the decedent never regained any vital signs and was clinically dead.
Thus, NYCHA established prima facie that the amount of time the decedent spent in the elevator did not have a substantial effect on her prospects for survival. The decedent remained in asystole, which is clinically dead, from the moment paramedics arrived through the time she was transported to the hospital. Plaintiff failed to present any admissible evidence contesting defendant's evidence or which would establish that she would have
had a better chance of survival had the elevator not stopped. Accordingly, NYCHA's motion for summary judgment should have been granted.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: FEBRUARY 15, 2018
CLERK